## COLUMBIA COUNTY OYER AND TERMINER.

SEPTEMBER, 1845.

EDMONDS, Circuit Judge, presiding.

### THE PEOPLE v. SMITH BOUGHTON.

This was one of the few mere political cases in this country, in which there has been a conviction by a jury. A report of the case cannot fail to be interesting. By a report of it as a mere law case, it would be shorn of much of its interest, for the main point of the trial was a question of identity. But there were so many other incidents connected with it, and which would not appear in a mere law report, that I have departed, in this instance, from my ordinary form of reporting my cases, and adopted a plan that may be regarded as rather a historical than a legal account.

How far I am excusable for my departure, I must leave for others to determine.                                                       J. W. E.

### ANTI-RENT TRIAL.

I HAD practiced law in my native county, Columbia, for seventeen years, when, in November, 1837, I moved to the city of New York and went into practice there.

In February, 1845, I was appointed circuit judge for the First District, consisting of the counties of New York, Kings and Richmond.

On receiving my appointment, I stated to my friend, Judge PARKER, Circuit Judge of the Third District, which included Columbia county, that I wished to hold a circuit in that county, and proposed an exchange with him. He readily agreed to it, but he could not give me his March circuit, because he was then to try the anti-renters, but I could have his September circuit. Accordingly I held the September court.

I had particularly noticed the proceedings in the anti-rent cases, at the March court, when, after a stormy trial of two or three weeks duration, the jury failed to agree on a verdict, and so the same case, contrary to Judge PARKER's expectation, and mine, would come before me for trial.

Before detailing the proceedings in my court, I must mention the circumstances which surrounded me, so that the difficulties I encountered may be the more readily appreciated.

During our colonial government large tracts of land in the interior, as it then was, but on both banks of the Hudson river, had been granted to the two families of Livingston and Van Rensselaer. They farmed out their lands by granting durable or life leases, reserving an annual rent, and a fine for alienation, amounting to one-quarter or one-third of the consideration money. The landlords were very unwilling to part with the fee, but held on to the leasehold system with great tenacity. As population increased, and the lands became more and more settled, this system grew to be very offensive to the people. The tenants fretted at the contrast between their condition of quasi vassalage and the freedom of other farmers around them who owned their own farms; and others, not tenants, chafed at the predominating influence thus attached to the landlords, and by them sometimes exercised offensively.

This gave rise to frequent outbreaks among the tenants, which were not always peaceable or unattended with bloodshed and violence. The earliest instance of the kind that came to my knowledge occurred early in the century, when I was quite a child, and when the sheriff of the county was shot while engaged in serving process on the Livingston manor. My father, who had been a soldier all through the revolutionary war, was, for that reason, appointed his successor, and I can recollect hearing him tell of the dangers which attended the discharge of his duties.

While I was studying law in Hudson, and, afterward, when I went into business there, I had occasion to become well acquainted with the injurious effects of this tenure. In the north part of the county the land was owned by its occupiers; in the south part it was rare that any was owned by any one except the landlords, and the consequence was that the people of the two sections were as unlike each other as if they had been of different nations. On the manor, the buildings were poor, the land poorly cultivated, though actually better land than in the northern towns, and the people were far more ignorant — school-houses and churches being infrequent — many of the people not being able to read or write, and some,

though born there, not speaking the English language, using a sort of bastard low Dutch, and rendering an interpreter necessary when they came into court as witnesses.

This state of things had continued for a hundred years, and was creating in the people an earnest determination to have an end to it. Thus ensued an outbreak, about 1844, more serious than any previous one. It extended over the counties of Columbia, Rensselaer, Albany, Delaware and Schoharie, and was frequently displayed in an armed and successful obstruction to the enforcement of the law. In Delaware county a deputy sheriff was murdered by a riotous mob. In Columbia county the high sheriff was taken prisoner by a band of some five hundred armed and disguised men, robbed of his process, in the presence of a crowd of some three thousand people, who, with pistols pointed at his head, burned the process in his presence.

The rioters called themselves Indians, and had names for their leaders, such as "Big Thunder," "Little Thunder," "Big Snake," etc. Their disguises were cheap and simple, but very effective. They consisted of pantaloons, frock and head piece of calico or muslin, and covered the whole man except merely his feet.

The force which had captured the sheriff of Columbia was commanded by "Big Thunder," wearing one of those disguises. Five persons were indicted, as leaders of that outrage, for highway robbery, and about fifty for being engaged in the riot. Dr. Boughton, a practicing physician of Rensselaer county, a man of education and of very clever powers of oratory, was indicted as the "Big Thunder." He and some others were arrested on warrants issued by a magistrate in Hudson, and taken to jail there. Threats of a rescue and of burning down the city were very vehement, and so imminent was the danger, that the governor called out several hundred of the militia from other parts of the State, and with them garrisoned and guarded the city until a special court was held at which the indictments were found. When, after several weeks of such garrisoning, those troops were withdrawn, a

band of two hundred men was permanently formed in the city, under the command of Captain Whiting, of the United States army, and armed from the arsenals of the State.

At the trial before Judge PARKER in March, in Hudson, the city was filled with anti-renters, as they called themselves, and it was seriously apprehended, and that by many judicious, discreet citizens, that even if a conviction should be had it could not be enforced.

The trials were conducted for the prosecution by John Van Buren, as attorney-general, and Theodore Miller, now a justice of the Supreme Court, then district attorney, and for the defense by Ambrose L. Jordan, afterward Attorney-General, and by James Storm, formerly a student in my office.

The trial that came off before me was that of Boughton for highway robbery. It lasted four weeks and a half, though our daily sessions were from twelve to fourteen hours each, and resulted in a verdict of guilty and his sentence to State prison for life.

The trial commenced on Wednesday, with my court-room and the city filled with anti-renters. There was an evident intention to overawe the court, and the necessity of very decided action on my part soon became manifest. The counsel for the defense was arrogant, disrespectful and assuming, both to his adversary and the court, and his outbursts of passion or wit drew forth from the crowd manifestations of applause in spite of all my efforts. One mark of disorder was quite conspicuous. The accused was out on bail, and omitted to be present at the hour of opening the court, until I admonished him that as the trial could not proceed without his presence, I should have to commit him to close custody, so that I might command his presence. His counsel also paid no attention to the hours appointed for commencing business. I could remedy that evil by causing the trial to go on without him, which I did on Friday morning. The counsel came into court that morning after the trial had been going on for half an hour, and it was soon apparent that he was very angry. Sharp words passed between him and the attorney-general,.

The People v. Smith Boughton.

which ended in blows. What then occurred is correctly told in the following account of it, extracted from one of the news-papers of the day:

From the New York Evening Post.

"FRACAS IN COURT AT HUDSON.—Judge EDMONDS is hold-ing the Oyer and Terminer at Hudson, and for some days an attempt has been made to procure a jury for the trial of 'Big Thunder' Boughton, the anti-renter. In the progress of the trial Mr. Jordan betrayed his usual virulence, and ultimately called Mr. attorney-general Van Buren a liar, which occa-sioned a personal conflict of which we have the following details:

"Wednesday and Thursday were occupied in getting only two jurors. This morning, when the court opened, Mr. Jor-dan was not present, and when he came in, in about fifteen minutes, some progress had been made in examining one or two jurors. Very soon after he had taken his seat some words occurred between him and the attorney-general which were not generally heard.

"The first remark which was loud enough to attract atten-tion was an expression by Mr. J. to Mr. V. B., 'You are a liar.' Mr. J. was sitting at the table immediately behind Mr. V. B., and instantly as Mr. J. used this offensive language Mr. V. B. struck him in the face with his right elbow. Mr. J. returned the blow by one with his fist, which hit the attorney-general in the back of his head. They both rose from their seats, faced each other and exchanged blows. This was all done with great rapidity, and Judge EDMONDS instantly ordered both to take their seats and the sheriff to take them into custody.

"The judge, after a brief consultation with his associates, announced a determination to punish so flagrant a violation of order, and directed the clerk to enter an order commiting both the gentlemen to the common jail for twenty-four hours.

"The attorney-general then arose and in a calm and respect-ful manner apologized to the court for the indecorum of which

he confessed he had been guilty. He could only say that he had been thrown off his balance by a persevering continuance on the part of Mr. J. in using toward him insulting and abusive language. He knew not how to account for its having thrown him so far off his guard, and he could not too strongly express his regrets at the occurrence. He would undertake that nothing of the kind should occur again, and he hoped that that assurance and his apology would be received as a sufficient atonement, at least so far as to justify the court in visiting the offense with a pecuniary penalty rather than with imprisonment.

"Mr. Jordan followed him, saying in substance that he was no more exempt from infirmity of temper than other men, but during a practice of thirty years he had never begun the use of offensive or insulting language. But he had often observed, and it had been particularly the case while practicing in this county, that members of the bar indulged in systematic efforts to irritate and offend him during the trial of causes. On the former trial, as well as during this, the attorney-general, who was a much younger man than he was, and comparatively inexperienced in the trial of causes, had assumed toward him an offensive and dictatorial tone, to which he would submit from no man ; and upon this occasion, before he had used the language imputed to him, the attorney-general had pronounced one of his statements false, and he would not submit to such an imputation, nor to a blow from any one, in any place, without resenting it. He regretted the present occurrence, because in it he had been led into a breach of order which he would not deny, but he would promise the court that nothing of the kind should occur again, for he would treat such conduct, at least in court, with the silent contempt it deserved.

"The district attorney, Miller, begged to repeat to the court the suggestion that a fine might be substituted as punishment, in order that the progress of the trial might not be interrupted.

"Judge EDMONDS said, in reply, that if he were at liberty

to consult his private feelings he would gladly listen to the suggestion, and even overlook the offense. And this, not merely because of his personal regard for both the gentlemen, but because he was aware that no punishment the court could award would be at all equal to that which their own sense of propriety, and their consciousness of their error, would inflict upon them.

"But the court had a higher duty to perform than to consult their private feelings, and, for his own part, he should regard himself as unworthy of his station, if he should allow any pain which he might feel to interfere with the performance of all his duty. And how could it be expected that the weak, the ignorant and the uninformed, should be made to respect the law and maintain order, if such violations of it, among those who were high in rank and station, and well informed, should be overlooked or visited otherwise than by an appropriate evidence of condemnation?

"The judgment of the court must therefore be enforced, and as it would not be proper to deprive either the prisoner or the people of their appropriate counsel, the court would adjourn for twenty-four hours.

"And, so, both gentlemen were committed to jail, and the court adjourned until Saturday morning."

It ought, perhaps, to be mentioned, that in an account of this transaction, in a New York paper, furnished by Mr. Jordan, it was said that Mr. J., in his address to the court, proffered a request that he and the attorney-general might be confined in the same room, so that they might fight it out between themselves. It is true that he did make such a proposition, but I took no notice of it.

It is also true that after the order for commitment had been made, Mr. J. directed his associate, Mr. Storms, to apply at once to one of the county judges for a habeas corpus. But as the law was, that every such process sued out during the session of the court of Oyer and Terminer, must be returnable in that court, nothing was done in that respect.

It was not the length or the severity of the confinement that were of any moment. It was the fact of imprisonment that gave force and efficacy to the reproof, and just as much purpose was answered by twenty-four hours' imprisonment as would have been by twenty-four weeks, or months.

One part of the reproof did not get into the newspapers. Both sides entreated that the court would not adjourn, but let the trial go on. I refused, for the reasons stated, but I added that "it was not my fault that the administration of justice was interrupted."

On Saturday morning, about nine o'clock, the imprisoned counsel were released and came into court. A great crowd was present, expecting a scene, but both gentlemen quietly took their seats, and resumed their business as if no interruption had happened.

About eleven o'clock, when the court took a short intermission, the attorney-general approached the bench, and in a low tone said to me, he hoped the court had slept well last night. And then, referring to an arrangement he and I had made, to go up that afternoon to Kinderhook, and spend Sunday with his father, he said, "I suppose our arrangement to spend Sunday with the old man holds good?" I replied, "Yes, so far as I am concerned." "Well," was the answer, "he'll be right glad to see you now."

About noon I noticed among the spectators, inside the bar, the attorney-general's brother, Colonel Abraham Van Buren, and Dr. Beekman, of Kinderhook, a particular friend of the President. I at once saw that they had heard of the scrape, and had probably been sent down to see about it.

When the court adjourned Colonel Van Buren threw himself in my way. He told me that they had not heard of it until that morning, when he, the colonel, was told of it, and immediately mentioned it to his father, at the same time expressing his opinion it could not be true. "I don't know," was the President's reply, "I think it is probably true; I know that John had determined that he would not again submit to the insults from Mr. Jordan that he had endured at the

previous trial, and he has probably resented them on the spot; and, if he has, EDMONDS is just the man to send him to jail, and you had better go down and see about it." I sent a message to the President, by the colonel, excusing myself for not accepting his invitation to spend the Sunday with him, as I was afraid the act would be misconstrued.

I remark, here, that the incident never in the slightest degree affected the intimacy of my relations with the President or any of his family. With Mr. Jordan it was quite otherwise. I had always, until then, been quite intimate with his family, but from that time he refused to speak to me, and all intercourse between our families was broken off by them. So far did this go, that when, some twenty years afterward, Mr. Jordan died and I expressed an intention to attend his funeral, I received an intimation from a friend of theirs that my doing so would be deemed an insult!

During the residue of the trial Jordan's deportment toward me was offensive and disrespectful, and tried my irascible temper rather severely. I deemed it best, however, to take no notice of it, and was well rewarded for my forbearance. I earned, and to the end retained, the confidence of the jury. Some incidents connected with this part of the trial had better be mentioned here than postponed to a later stage of narrative.

Immediately on his discharge from imprisonment, John Van Buren sent to the governor his resignation as attorney-general. I heard of it, and promptly wrote to the governor a letter urging him not to accept the resignation, for though the disorder had been such, as under the circumstances to render it necessary for the court to assert its authority in the most decided manner, yet there had been nothing derogatory to Mr. Van Buren's character as a gentleman, and I did not see how a man of honor could have done otherwise than to resent so gross an insult as he had received and then submit to the consequences like a man.

I received a reply from the governor, saying that he had refused to accept the resignation.

We spent two weeks in getting a jury.

One hundred jurymen had been summoned in the first instance. Their names were drawn from a box containing all the jurors of the county, and, as was to be expected, quite a number of them were from the infected district, who, if they did not sympathize with the anti-rent feeling, might be at least afraid to return home after giving a verdict of guilty. Hence the great effort of the defense was to get one of those sworn as a juror, for then might be hoped a disagreement of the jury, if not an acquittal, and thus again the administration of justice be obstructed.

The defense had a right to challenge twenty and set them aside without assigning any reason, and both sides had the right, which both exercised, of challenging every juror for cause assigned. The cause assigned was the formation or expression of an opinion, and each juror was subjected to the severest scrutiny. The result was that every man from the infected district was excluded. The challenge was tried by two triers. Those triers were appointed by me until two jurors were accepted, and thenceforth they became the triers of all the others. I took care in my appointment to have sound, discreet men, and the consequence was that two jurors were soon obtained, and then fairly began the battle of getting a jury, which, as I said, consumed some two weeks. During that time a number of incidents occurred of interest, and I will mention some of them.

It was quite apparent from the beginning that neither the accused or his friends expected an acquittal. The limit of their hope, and the object of their effort, was to get some one or more on the jury who would cause a disagreement and thus prevent a conviction, and for the two weeks that we were engaged in impaneling the jury this was the struggle. And among those who had been summoned on the jury, were some who were anxious to become jurors for that purpose.

One man, who had sat by and for six or eight days had heard successive jurors examined, was at length called and examined. He swore in the roundest manner that he had formed no sort of an opinion on the subject, and of course had

expressed none — that the whole matter was one of entire indifference to him, and that he had no feeling about it one way or the other. The attorney-general suspected him, and subjected him to a very severe and searching cross-examination, lasting several hours, and finally closed it, with the conviction on his mind that the man was a good juror. I did not submit the question to the triers that day, but adjourned my court at an earlier hour than usual. After the adjournment I sent for the district attorney and told him I had known that man well during my residence in the county, that for some twelve or fourteen years we had been engaged in military matters together; when I was adjutant he had been a sergeant, and when I became colonel he was a captain, and we had been associated together in politics, and I knew him well enough to know that his pretended state of indifference was entirely alien to his character; that he never saw two dogs fight without taking sides, and as he lived on the borders of the manor and on the main road to market, and within half a mile of a tavern where the anti-renters were in the habit of stopping, and as these disturbances had been going on for some two years, I was convinced that his story could not be true. I advised the district attorney to send out and summon the man's wife and children and some of his neighbors as witnesses on the question of his alleged indifference — to summon also his apprentices and journeymen, for he was a carpenter, and a driving fellow, and doubtless had such men in his employ; and when I had been riding out, a few days before, I had noticed that he had built him a new house, and, as he was penurious, he had doubtless let out some part of it, and I directed such tenants to be summoned, and that all this should be done in such manner that he should know nothing of it until the witnesses were produced in court.

So, when the court assembled the next day, and his trial as a juror was resumed, those witnesses appeared and were examined. From that examination it appeared that he was a ferocious anti-renter; that when he had heard that the sheriff had been shot at, he had said he was glad of it, he wished he

had been killed; that at the previous election in his town he had been at the polls all day, actively electioneering for the anti-rent ticket, and repeatedly declaring that no man, unless he was an anti-renter, ought to be allowed to vote; that he was a member and secretary of a secret anti-rent society, and had actually contributed, from his own means, toward defending the prisoner on that very trial.

Of course, he was rejected; and it was not a little interesting to me to watch his countenance during the two or three hours that the testimony was coming out, now a little from one, and then some from another. He sat where he was plainly to be seen by me, and the whole crowded audience, and the agony of shame which he endured during his exposure, was punishment enough, and doubtless has lasted his whole life. He was a smart fellow and knew me well enough to be aware from what source the exposure had come. The incidental influence of his exposure was very great.

Another man was examined as a juror who was a tenant on the manor. I knew him well, too, for he had once been a client of mine. He said he was not present when the sheriff was robbed, but had heard the whole story from his neighbors who had been present, but he insisted that he had formed no opinion on the subject. He was a dull, stupid sort of a man, incapable of taking in more than one thought at a time, and that was, that he must get on the jury if he could.

He also underwent a rigid cross-examination, on which he was asked who were the neighbors who had told him the story? And when he named them, he was asked if he did not believe them? He said he did not. He was then made to say that he had known those men ten, twelve, fifteen or twenty years; that they were men of fair character, and regarded on all hands, for years, as men of veracity, and during all that time he had often been told by them various things, such as the news from town, the price of produce, the result of elections and trials in court, and the many matters about which the neighbors would converse, and about such things he had never doubted the truth of what Mr. Huysrodt, Mr. Gissel-

bargh, Mr. Shaver, Mr. Knickerbocker, etc., etc., had told him.

After these admissions had been drawn reluctantly out of him, the attorney-general asked him, why, if he had always, both before and since the robbery, believed what they told him, he had not believed them on this occasion?

Mr. Jordan objected to the question, and arose to argue the objection. Van Buren objected to his doing so, because it was self-evident that the question was a proper one, and that the object of the counsel was to put the juror on his guard, and warn him of the consequences of his answer. I ruled, however, that the counsel must be heard, and for half an hour he labored the question hard, and several times stated what answers might be given to the question, and what would be the result. He continued this, until convinced that the dull juror fully comprehended him. Van Buren arose to reply, with an air that plainly implied his consciousness that Mr. Jordan had attained his object. I refused to hear him, saying that the question objected to was eminently proper, and had been again and again asked by both counsel in the progress of the trial.

The juror was then asked the debated question, and promptly answered that he had not said he had believed those neighbors on any of the occasions mentioned. The attorney-general pressed him hard, but he had got the one idea in his head, and doggedly insisted that he had never believed those men, and had not said he had ever believed them. The attorney-general gave him up in despair, and I took him in hand. I was then in the habit of taking full minutes of all testimony, and I did that with great accuracy.

I referred to my minutes, and reading to him some fifty or sixty instances in which I had recorded him as saying that he had believed those men, I asked him if he was to be understood as saying that in all those cases I had been mistaken? He answered that I was wrong; and thus, step by step, paragraph by paragraph, he was made to contradict every thing that he had testified to. Then I called the attention of the

The People v. Smith Boughton.

triers to the remarkable exhibition he had made of himself, and submitted it to them to determine whether they were willing to trust the administration of justice in such hands? He was promptly rejected. Poor fellow! While going through this process he was terribly agitated. The sweat broke out upon him, and, having no handkerchief, he frequently wiped his face with the tail of his coat.

The first one hundred drawn by lot being exhausted without obtaining the twelve competent, it became necessary for me to order talesmen to be summoned. I could have ordered the sheriff to do that, and he could have summoned whom he pleased; but, as the sheriff was the prosecutor in the case, I ordered the attendance of one of the four coroners of the county, and selected him from one of the northern towns, the infected district lying south of a line drawn east from Hudson to the State line, the northern towns being entirely untouched by the excitement; and I directed him to summon another hundred to attend court forthwith, and to summon them all from the northern towns. The men whom he summoned were first rate men, and it was remarkable that though summoned, the farmer from his field, the mechanic from his work, or the trader from his store, every man answered to his name, and many of them without even having waited to change their working dresses.

Out of this additional number we obtained our requisite number of twelve, and were ready to proceed with the trial on the merits. But before doing so I called the attention of the jury to the fact that after the two first jurors had been obtained I had received a copy of an anti-rent newspaper printed in Albany, which contained a letter from Hudson, saying that two jurors had been obtained, that one of them was from the south part of the county, and was all right, etc. The jurors referred to, promptly denied the imputation, and the effect evidently was to produce a sound state of feeling among them.

At their July Term, preceding my court in September, the Supreme Court had pronounced a decision reversing a convic-

tion before me of Mary Bodine for murder.   On the scrutiny of the jury in that case, I had ruled that an opinion formed from rumor or a newspaper report did not necessarily disqualify a juror, but if the triers were satisfied that he could, notwithstanding, find a verdict according to the evidence, they ought to declare him competent.   The Supreme Court, however, ruled that any opinion, however formed, and however fixed or radicable, disqualified.   That decision I followed, of course, on this trial, and it was frequently referred to by the attorney-general as the basis on which he asked the exclusion of jurors.   It was also frequently referred to by the counsel for the defense, but for a different purpose.   After his commitment to prison he was full of wrath, and, as I have mentioned, he was often disrespectful to me.   I took no notice of his rudeness.   I could afford to overlook it.

But at times it went a good ways.   Once he said to the triers, that on the former trial they had had the advantage of having a gentleman for a judge, and he often sneeringly commented on the fact that many exceptions had been taken to my ruling in the Bodine case, and my decisions unanimously overruled.

On the trial of one of the jurors the attorney-general had insisted that his having formed an opinion from mere rumor, of itself disqualified him.   Mr. Jordan very earnestly combatted the idea, and insisted upon it that such could not be the law, for it would inevitably exclude from juries the educated and well informed, and commit the administration of justice to those who were too uneducated to read the newspapers, or so secluded from communion with men as to be ignorant of what was passing around them.   He argued the point with great zeal, and I aided him by frequent questions and suggestions.   After he had concluded I told him that such was my opinion also, and I agreed with him entirely; that such had been my ruling in the Bodine case, and I had no doubt that if the question had been as ably argued before that court as it had just now been argued before me, that court would have come to the same conclusion.   But unfortunately

that court had decided directly the other way. I then took from my desk a manuscript copy of that decision, for it had not yet been published, and read passages which showed that my ruling had been in exact conformity with Mr. Jordan's views, and for that reason alone had been overruled, and I was bound to follow the ruling of my superiors on the bench, whatever might be my own opinion of its soundness.

After this I heard no more, on this trial, of the Bodine case, and I may as well remark in this connection that the Supreme Court afterward took back its decision in the Bodine case, and sustained the ground I had there taken.

After some nine jurors had been obtained I wrote to the Chief Justice, saying that I had already been detained on that trial much longer than I had anticipated, and it was now quite evident that it would occupy so much time that my appointed court in New York would fall through, and I requested him to detail some other judge to finish the trial in Columbia and allow me to return to my circuit. In his reply he declined to accede to my request, and, speaking of the difficulty I had had in obtaining a jury, he wrote that the opinion of the court had been misunderstood, and that they had intended to say that an opinion formed by the proposed juror might or might not disqualify, according to circumstances, and that discreet triers, of good sense, could easily get along with it. This was virtually as I had ruled in the Bodine case, and I read it to the triers. Up to that time they had adhered to the decision of the Supreme Court in the strictest sense its language would bear. Now, on hearing this explanation by the chief justice, they altered their action and my jury was soon filled.

Then the trial on the merits began.

The point which the prosecution had to make out was the identity between Dr. Boughton and the armed and disguised man known as "Big Thunder," and who had commanded the band of armed and disguised men, when they had captured and robbed the sheriff, and burned his process. A strong piece of evidence on that point was the testimony of a man who was included in the same indictment with Boughton, and

who, when indicted, had fled the State.  After remaining an exile from his home, his family, and his property for some months, he tired of his condition and voluntarily returned and gave himself up to justice, and was in confinement in jail at the time of this trial.  He testified that he was present at the robbery; that it was his disguise, made for him by his wife, that Boughton wore when acting as "Big Thunder;" that he helped to dress him in it before he took the command, and helped to undress him when the affair was over; and the dress was produced in court and identified.

Another piece of evidence was that of a shoemaker, who was sitting in a wagon in front of the tavern, from the piazza of the second story of which, "Big Thunder," in his disguise, was haranguing the multitude.  He said that "Big Thunder," during his speech, frequently put one foot on the lower rail of the balusters of the piazza, so that the sole of his boot was visible to him, and he noticed the peculiar manner in which it had been half-soled.  When, afterward, Boughton was arrested in his ordinary garb, his boots were found to answer precisely to the description, given by the shoemaker, of those worn by "Big Thunder."

There was other evidence given on the same point, so that, at the close of the case for the prosecution, it was quite clear that Boughton was "Big Thunder."

Then came the defense, which, it was opened to the jury, would consist of proof of an alibi—that Boughton was somewhere else while the capture and robbery were going on.

An attempt was made to break down the testimony of the accomplice who had turned State's evidence.  For that purpose, his wife and his mother were examined as witnesses, and they swore that he was insane, and had been for years.  On their cross-examination it was proved, that during that very time of his imputed insanity he had married and had several children, whom he brought up properly; that he had held several town offices, among them the collector of taxes; that he was a class leader in the Methodist church; had always managed his own affairs, and that so prudently that he had

arisen from the condition of a day laborer to being the owner of a farm; and had not only supported his family, but had given a home to his mother.

These facts were drawn out of the witnesses, as it were, by cart ropes. The wife was first examined, and when, on cross-examination, any question was asked showing these things, her recourse was a flood of tears, and a fit of sobbing and crying. This was repeated so often that I had to tell her that she must suppress her emotion, for her indulgence in it was depriving the State of its right to a cross-examination, and that if she persisted in that course I should have to instruct the jury to disregard her testimony. She paid no attention to my admonition, and was finally sent from the witness stand without finishing her examination. The mother was next examined, and before her cross-examination was finished, the court took a recess of an hour for dinner.

At the reassembling of the court these women were not present. After waiting about fifteen minutes the sheriff was sent after them. In about the same space of time, he returned with the report that immediately on the court taking a recess, they had gone to their tavern, ordered their horse, and driven from town. He was directed to pursue them. The next morning he reported that he had followed them to the State line, a distance of thirty miles, and they had crossed the line into Connecticut about half an hour before he got there, their having at least two hours the start of him having enabled them to do so.

The first three days of the defense was occupied with this testimony, and that upon several minor and unimportant matters — the alibi not being touched — so that many thought it would not be gone into at all. I knew better, and how I knew it was one of those singular things which made me think that of all our judges I was best capable of getting a result to the trial.

There was at the time, in Hudson, a journeyman printer — a dissipated chap — who had been orderly sergeant in a uniform company of which I had been captain, and who was

warmly attached to me. Early in the trial he came to my lodgings and told me that he was determined that I should not be cheated as Judge PARKER had been on the former trial, and he had therefore joined the anti-renters, and was one of their committee of arrangements for the trial; they met every evening, and about eleven o'clock every evening he would come and tell me of their proceedings. So, during those three wasted days he told me every evening that they could not begin the alibi, because they could not get any one to start it, they were so afraid of me. On the third evening he told me they would start the alibi the next day, for they had sent to Mount Washington—a hill on the borders of New York and Massachusetts—for the "one armed tin pedlar," who had not yet been present at the trial, and had not been scared as the others had been, and he would be in town by morning.

And sure enough! The next day the defense of the alibi was entered upon, and by the "one armed tin pedlar," and then followed twelve witnesses who testified that while "Big Thunder" was operating with the sheriff they saw Dr. Boughton elsewhere in citizen's dress.

Among them was a negro man, who testified that he was present at the robbery and helped "Big Thunder" take off his disguise after the affair was over, and it was not Dr. Boughton, whom he said he knew very well. His testimony was given on Saturday, and the next day I was called out of church by the District Attorney, who introduced me to a man who said he had heard the night before of the negro's testimony, and had come into town to let me know that on that very day of the riot the negro had been at work for him all day long, at least twelve miles distant from the scene he had pretended to be at.

I took his deposition and issued a warrant to arrest the negro for perjury. The sheriff started immediately for the manor to serve the process. The next day the sheriff reported to me that he had not gone five miles from town before he was overtaken by a man riding furiously on horseback, without saddle or bridle, and with only a halter, who passed him

rapidly, and he had hardly gone another mile before he was surrounded by a number of men on horseback, who accompanied him on his whole ride, going and returning. And when he turned into any by-road some two or three of them would ride ahead and give warning of his coming, so that when he arrived where the negro lived he had fled a few minutes before, and his attempt to arrest him failed.

Another fact came to me from my informer and was proved on the trial; namely, that one of the men who proved the alibi, who was a tailor in the town where the affair happened, met an acquaintance who said to him " Jones, I understand you swore you saw Boughton at dinner in the tavern? You told me you was going to swear you saw him going from the tavern across the public square toward the crowd." " So I did," was the reply, " but the —— tin pedlar got him into the house and I couldn't get him out again."

This evidence, and other of a cognate nature, which I need not here detail, convinced both court and jury that all the testimony as to the alibi was a sheer fabrication, and I was satisfied that at least seventeen persons swore falsely on that trial! To have procured a satisfactory result under such circumstances was hardly to have been hoped for.

There was one embarrassment in the case that caused me a good deal of anxiety. The offense charged in the indictment was a capital one, as it involved the possibility of imprisonment for life, and all bail is usually refused in such cases, because, as there can be no conviction without the personal appearance of the accused on the trial, letting him to bail would virtually give him the choice between paying a sum of money by forfeiting his bail, or undergoing the death penalty or imprisonment for life, which are the punishments in all " capital cases."

During the trial before me Boughton was at large, having, much to my surprise been let out on bail by one of the county judges, and I was often told by leading men, and the most distinguished of the lawyers of the county, that I must commit him to custody, for if I did not he would be missing when

the jury brought in their verdict, and thus cause the trial to fall through. I felt the full force of this suggestion, and saw at once that if I did not commit him the whole responsibility of the failure of the trial might fall on me. On the other hand I feared mischief might ensue from my ordering him confined, for it might be said that I thus prejudged the case, before hearing the testimony, and had trammeled his action so as to deny him the full opportunity of preparing his defense, and such an idea, once entertained and believed in, as it would be by some, might seriously impair my influence with the jury, which it was of the last importance to preserve.

So I worried through the trial, constantly full of anxiety on this subject, and indulging the vain hope that something might occur, during its progress, to warrant me in committing him. At length, when all the testimony had been given, and Mr. Jordan was summing up to the jury, and Boughton was sitting in front of the counsel and jury, with his wife by his side, I directed the clerk to enter an order committing him to custody and to hand me a certified copy of it, but not to let it be known to any one. As soon as the copy was ready for me I called the sheriff to me, handed it to him and told him that the accused was now in his custody, and henceforth the responsibility was on him as to his presence ; at the same time I told him it was important to keep the thing as quiet as possible, lest, getting to the ears of the jury, they might infer my opinion of his guilt, and therefore he had better merely keep his eye on the prisoner and not permit him to leave the court-room.

After the lapse of an hour or so, Mrs. Boughton wanted to retire from the very crowded court-room, and her husband accompanied her to the door. There the sheriff met him and they retired together from the room. Directly the sheriff and prisoner returned into the court-room, the latter called out his wife's father and returned to his former seat. In the course of an hour or so there was an intermission of a few minutes and Mr. Jordan suspended his remarks. As soon as he did I saw the prisoner go up to him and say something to him.

The counsel was very angry, and approaching close to the bench, said to me, in a low and very bitter tone, "My client tells me, sir, that he has been committed to custody. I desire to know of the court if this is so." "Yes, sir," was my reply, "but the fact is unknown but to him, the sheriff and clerk, and will not be more known unless you or he choose to disclose it." So I heard no more on that subject, and I was greatly relieved by the success of a course which I had marked out to myself from the beginning, but had mentioned to no one.

The case was finally submitted to the jury, by the closing of my charge to them late in an afternoon. Early the next morning I received a message from them, that they had not agreed and wished to be discharged. After breakfast I went to my court-room and had them brought before me. I told them I could not discharge them; that the case had been twice tried, and the interests of public justice imperatively demanded that it should now be finally closed; that I did not mean to extort a verdict from their sufferings or starve them into an agreement; that as I came along I had ordered breakfast for them, which would be there in a few minutes, and they would have their dinner and supper at the usual hours, and the next night they would have beds, but I must insist on their agreeing to a verdict.

They then retired to their room, and from its windows they saw me mount my horse and ride off, leading another with a side-saddle on him. I then took a ride of two or three hours, accompanied by a lady who was a stranger in those parts. In order to show her the beautiful scenery of the locality I took her to many by-roads, and thus it happened that, when I struck the main road on my return, I met one of the sheriff's officers, who told me the jury had agreed more than an hour ago, and the sheriff had sent his officers in all directions to find me. I repaired to the court-house, and about eleven o'clock in the morning received the verdict of guilty. I then adjourned the court till two o'clock to pronounce sentence.

My court consisted of myself as presiding judge, five county

judges, the mayor, recorder and four aldermen of the city of Hudson.

The city officers did not sit with me until I directed the clerk to summon two of their number, such as they might select for that purpose, and thenceforth the mayor, Cyrus Curtiss, and the recorder, Robert McClellan, always formed part of my court. When the verdict was given I summoned all the judges to meet me immediately at the hotel, to agree upon a sentence. They all met me except one of the county judges, who was a vehement anti-renter, and refused to come.

Of the seven who did meet five were lawyers, one a merchant and the other a farmer. The law allowed us a wide range in our sentence — from imprisonment for ten years to that for life.

I told the judges that I was in favor of imprisonment for life, and I gave them my reasons, viz.: He was a man of education; from another county; himself suffering none of the evils of this manorial tenure; that he had gone into a foreign county and stirred up hundreds of ignorant but well-intentioned farmers into an armed insurrection against the supremacy of the law, over fifty of whom had been indicted and were then awaiting trial; that during the trial he had sent me an offer to turn State's evidence, which I had rejected even without consulting them; and that he had now defended himself by an extraordinary mass of fabricated testimony, all of which he knew to be false; and that under such circumstances giving him the extremity of the law would at once put an end to the whole disturbance and do away with the necessity of trying any more of the indicted ones.

The mayor alone agreed with me in opinion, and it required four votes to fix the sentence. The other judges varied in several periods, from ten to twenty years.

After a long discussion, without much appearance of an agreement, the first judge proposed to let me pronounce what judgment I pleased, and to that they all agreed. I told them no. I did not live in the county, and when I went away I was going to leave some one behind to defend the sentence,

and it was therefore their judgment I was going to pronounce.

The discussion resumed again, and with as little prospect of an agreement as ever, when the dinner bell rang. The first judge turned to one of the county judges, and said, " Come, Judge, there's the dinner bell; you go for life and I will." The other judge assented, and thus the sentence was fixed. It was the old story —

" The culprit must hang that the jury might dine."

When, at two o'clock, I went to my court-room to pronounce the sentence, the scene was absolutely appalling. At least five thousand people were present. The court-room and the passages leading to it were densely crowded, as were the vestibule of the court-house, the platform in front of it, and, at least, half the park around it. Word had gone forth into that and the adjoining counties, that the trial was about closing, and back hurried that crowd of anti-renters which had met me at the beginning of it. The captain of the municipal guard offered me an escort of his company, and the sheriff an escort of his deputies and constables. I refused both and went entirely alone.

When I arrived at the outskirts of the crowd, I found it very noisy and angry, and it took me fifteen or twenty minutes to work my way through into my court-room. I would request them to let me pass. They would open a passage for a few feet, then block my way, and damn and abuse me to their hearts' content; but at length, after going through this process some dozen or two times, I made my way through.

On entering the court-room I found even a worse scene. Every one was standing up, even on the benches and the tables; they had their hats on, and talking was as vehement and loud as ever I witnessed at any exciting election. My presence seemed to make no difference with them. As soon as I took my seat on the bench, the sheriff came up to me, in a good deal of agitation, and told me he could do nothing with the crowd; he had ordered them to be seated and silent, but they paid no attention to him, and he didn't know what to do.

I told him to take his seat and be cool. It would all come right. In a few minutes the spectators were seated, hats were off, and silence reigned in my court-room. It was a glorious triumph of the majesty of the law.

When order was restored, I directed the sheriff to bring the prisoner into court. He was confined in an adjoining part of the building, and had to be brought through the excited crowd. The sheriff began to collect his posse of constables. I called him to me and told him to go alone and bring the prisoner in. He said he couldn't do it; they would rescue him. I told him to try it; that I thought there would be no such attempt made; if they intended it, we had not power to prevent it against these thousands, though we had power enough to make a disturbance; but there would be no danger if we did not by our fears put the idea into their heads. He accordingly went alone, and he did alone bring him through that crowd, and alone took him back after the sentence had been pronounced.

The proceedings, after the prisoner was put to the bar, were detailed in the newspapers of the day, and I insert here an accurate account of them from the *Evening Post*. One incident struck me at the time. A death-like silence prevailed while in a low tone I pronounced the sentence. No one but the judges knew what it was to be until I came to the passage—"You are now to be withdrawn for the residue of your life from the society," etc. Then there arose from that dense crowd an involuntary drawing in of their breath, quite audible, but, oh! how wonderfully impressive!

From the New York Evening Post.

"This afternoon at two o'clock the prisoner was placed at the bar to receive his sentence. The court-house was crowded in every part in the most dense manner, but during the whole of the concluding scene of this extraordinary trial, the most profound silence was maintained by this vast multitude.

"When Dr. Boughton was asked if he had any thing to say why the sentence of the law should not be pronounced upon him, he spoke a few words, denying that he had done any

thing forbidden by the institutions of his country, as he understood them, and requested that his wife might be allowed to remain in the jail with him during his stay there.

"Judge EDMONDS then proceeded to pass sentence upon him. I have obtained a copy of his remarks, which I send you. The prisoner was not affected by it as much as the audience or the judge seemed to be. He was immediately remanded to prison, and before to-morrow morning he will be on his way to the Northern State prison."

#### JUDGE'S SENTENCE.

Smith A. Boughton — you have been arraigned and tried on a charge of robbery, and a jury, almost of your own selection, have found you guilty of the charge.

You have had a very fair trial. The jurors were selected with great care, two weeks having been spent in subjecting their opinions to the severest scrutiny, and you have yourself afforded the best evidence that they were eminently impartial. You have been allowed to go at large and fully to prepare your defense. You have been defended by able counsel. You have been surrounded by numerous friends, and every item of evidence, which you or they deemed material to your defense, you have been allowed to lay before the jury. You have been, notwithstanding, convicted, and it now only remains for the court to pass sentence upon you.

Your offense, though in form it is presented to us as robbery, is in fact high treason, rebellion against your government, armed insurrection against the supremacy of the laws.

Until you came among them, the tenantry on the manor were, in outward deportment at least, whatever might have been their feelings, a quiet, orderly, law-observing people. Yourself suffering none of the evils of the tenures of which you complained, you came here a volunteer from another county. If you had confined your operations within lawful and peaceable bounds, you would doubtless have encountered, and perhaps been aided by, the sympathy of many wise and

good men, to whom the evils of those tenures are as apparent as they were to you. But such was not your purpose.

You came accompanied by a band of armed and disguised men. You early avowed your intention to resist the execution of the laws. A man of education, you well understood your duty to your country, yet when remonstrated with on the impropriety of your course, you admitted that you knew it to be wrong, yet you avowed your intention to persist in your measures of resistance, because thus alone you could attain your end.

Possessed of a species of popular eloquence, you made your appeals to the interest of the tenants by holding out to them the prospect of exemption from the payment of rent. To the more lawless and depraved among them you held up, by means of the disguises which you were the first to introduce among them, the hope of impunity for any crimes they might commit. You thus enlisted in your service several hundred men, whom you publicly paraded in different parts of the county, armed and disguised. And you publicly notified them to meet you on the appointed day, armed and equipped, to resist the sheriff in the discharge of his duty. When that officer arrived at the village of Copake, in the peaceable line of his duty, you placed yourself at the head of your armed band, and with pistols cocked and swords drawn, you captured him. You warned him not to proceed, but avowed that you had thus met to resist him, and that you intended to do so, even to the shedding of blood. You held him a close prisoner for several hours. You surrounded him with your armed associates, and finally, with your pistol presented to his breast, you compelled him to surrender to you the legal process which it was his duty and his purpose to execute. Not content then to discharge him, but most fully to manifest your contempt of the law and its process, you kept him your prisoner until, in his presence, and that of the multitude whom you had assembled there, you burned the papers of which you had thus robbed him.

You afterward, surrounded in the same manner, publicly

avowed that you and they were thus armed in order to resist the sheriff and his posse, in any attempt to arrest you for the crime you had committed. And you carried out your purpose by calling upon your associates to stand by you when he came to arrest you, by causing yourself to be rescued from his custody, and by yourself presenting a loaded pistol at him and threatening to shoot him with it.

Under the impulse which you have thus given, and in imitation of your example, peaceable inhabitants have been driven from their homes at night; houses have been torn down, farms laid waste, the laws forcibly resisted, and the officers of justice fired upon and wounded while in the discharge of their official duty.

These offenses, serious as they are, have been aggravated by the recklessness with which you have persisted in pressing upon the court and jury testimony which you knew to be false.

You have been the leader, the active instigator, the principal fomenter of all these disturbances. You have made yourself an example of disorder and violence, and you have caused many erring and misguided men to follow it, to their ruin and the disturbance of the public peace. You have, therefore, rendered it necessary that the court should cause you to be a warning example of the certain consequences of such conduct — that your misguided followers, and all others, may learn from your fate the important lesson that order must be maintained, the laws must be enforced.

Deeply as we may feel for the ruin which you have brought upon yourself and those connected with you, our duty teaches us that forbearance toward you now, when such forbearance toward you heretofore has only led you on to acts of more aggravated outrage, would be cruelty to the ignorant men whom you have misguided, and to the community which you have so deeply injured.

You are therefore to be withdrawn for the residue of your life from the society whose peace you have so wantonly disturbed, and whose laws you have so violently and so frequently violated, in the confident hope that, from the example of your

fall, all may learn the salutary lesson that the supremacy of the laws must and will be maintained.

The sentence of the court is, that you be confined in the State prison in the county of Clinton, at hard labor for the term of your natural life.

After this prisoner had been withdrawn, the others who had been indicted were called before me. They and the sureties for their appearance made quite an assemblage. I told them that I did not propose to try them then; that I believed enough had been done to answer the ends of public justice, enough to show them the mischief and folly of their conduct, and enough to convince them of the supremacy of the law under all circumstances. I was as fully aware as they were of the injurious effects of this manorial tenure, but they must look to the law, and the sure work of time, for the redress of their grievances. I should now hold them to bail for their appearance at the next court, in the following year, and if in the mean time they showed by their deportment a just appreciation of the forbearance toward them, I would advise the attorney-general to enter *nolle prosequis* on all the indictments, and discharge them all from farther prosecution. They gave their bail and returned home. No further disturbance occurred in that county, and in due time they were all discharged.

After these proceedings I adjourned my court. Before I left Hudson, to return home, the sheriff called on me and said he was afraid he should not be able to take the prisoner to the prison unless he had a strong escort, for there were many anti-renters still lingering in the city, and he would have to pass through the anti-rent counties of Albany and Rensselaer. Again I told him to have no fears, and to go alone, or with only one assistant. He did so, and without any trouble safely left him in the State prison.

I had paved the way for the trial by my charge to the grand jury at the commencement of my court on the previous Tuesday. I extract from a Hudson paper:—

"JUDGE EDMONDS' CHARGE.—The charge of Judge EDMONDS to the grand jury, on Tuesday last, was one of great ability and force, and cannot fail of having a happy influence upon the minds of those who heard it. He impressed upon the jury the importance and high responsibility of their duty, and after alluding to the peculiar features of our institutions—the cheerful submission of our citizens to the government and laws, and the alacrity with which the sovereign people of this country had always sustained them without the intervention of a standing army, as in other countries, he then passed on and dwelt at some length upon the outbreaks which had taken place in our own State and neighborhood. He alluded to the leasehold tenures, and the marked difference which was everywhere observable in the intelligence, morals and industry, of those who were lords of the soil, and those who resided on leased lands. This, he was happy to say, was rapidly passing away. The first settlers of the country saw the dangers of it, and our legislature at an early period passed laws prohibiting the entailment of property, by which vast estates would descend from generation to generation, through the eldest son, as in the old countries. He assured the tenants they could gain nothing by a resort to violence and force; that they must rely upon the force of public opinion, and a strong sense of justice, in bringing about a happy reconciliation, and an amicable arrangement between themselves and their landlords. He told them they must not look to the legislature for an abolition of their leases, for the Constitution of the United States forbids any State passing laws impairing the obligation of contracts, He assured them that they could not expect relief until they abandoned their present organizations and opposition to the laws, and separated themselves from the base and the guilty, and used their exertions to bring them to justice.

"We regret that we are unable to lay the whole of this admirable address, which occupied almost an hour in its delivery, before our readers. In conclusion, we would merely remark, that it reflected great credit upon the talent and ability of the judge."

22—vol. 1.

Some months after this I was appointed by the Prison Association of New York, one of a committee to inspect all three of our State prisons. When I arrived at the Clinton prison Boughton was there, and in charge of the hospital. We spent several days there, and one part of our duty was to see every prisoner. While we were doing this at Clinton, and approaching near to the time when I should see Boughton, one of the keepers came to me and said they had observed that he was very much excited since my presence there, and they had closely watched him, and finally searched him and found that he was armed with a concealed knife, and they had so dealt with him that he had avowed to them that his intention was to kill me; that he was condemned to spend his days there, and that he had rather be hung for killing me than drag out all his life in that prison, etc. The keeper proposed to lock him up in a cell until I left. I told him that would not be worth while, but only keep an eye on him and it would not be necessary for us to meet. Without hearing any thing more on the subject, I concluded my inspection and left without seeing him.

Speaking of this threat reminds me of others. I received about that time quite a number of anonymous letters, two only of which I find among my papers, and I insert them here.

The following bore the post-mark "New Orleans, La., October 30," and was addressed "Hon. Judge EDMONDS, Hudson, N. Y.":

NEW ORLEANS.

SIR: You packed, you charged and dictated to the Miserable Tools, the jury in Boughton's case. But there is A Jury for you in Hell you Blood Hound, and waiting anxiously To Cluch you. If there is not a hole through Your Heart Before a month you will Bee lucky. You Reverend Iniquity. How much Do you Get for procuring the Conviction of that innocent Man and Prostituting the Sacred Cause of Justice for innocent he is of any Crime and has the Sympathies of two thirds of this city. When you are Stabbed as You will bee

you shall have the sympathies of the Dogs that knaw your Bones. No more at present from your friend till death.

The following was mailed at Boston, October 7, and addressed " Judge EDMONS, Hudson, New York ":

BOSTON, October 3, 1845.

For the words " Why did you not kill the scoundrel Sir."

These words of yours show that you are utterly regardless of human life. That you love human blood. That you are a villain in fact and an open enemy to the rights of man. Your charge to the twelve Enemies of our common race shows you to be a brutal monster.

I the writer have information which I would not dare to be let known. I tell you plainly that their is an association of 7 that have sworn by the hearth stones of their fathers that his rotten Patroon carcase shall disapear from amongst men.

Your Blood when you think not, we have 3 ways to do it, we will accomplish the job.

MOLLY MAGUIRE & REBCKA.

The first paragraph of the foregoing will be best understood when I say, that during the examination of the sheriff as a witness, when he detailed how he had been captured, I had asked him if he knew that he had then a right to shoot down the man who seized him? He answered that he did not know it, and I told him, as I said, for his information and that of others, that he had such right.

Besides these letters I had some others which I will here insert. One was mailed at Hudson, November 13, and addressed, " For Judge EDMONDS, Hudson, per J. Davis," and was as follows:

NEW ORLEANS, September 30, '45.

SIR: It appears you have Secured a Jury to try Boughton Well you may try him & Convict him But if you attempt to Execute him you shall Do it By the Light of all the Houses

In hudson   It is my Native Place  But it is Cursed by those you have for the present Exiled    And we shall Return in time to take most Signal Vengeance Upon our persecutors.

LITTLE THUNDER.

FROM THE GOVERNOR.

ALBANY, October 4, 1845.

My DEAR SIR: Your letter of the 2d, with the testimony, was handed me yesterday.   I take a moment to acknowledge it, and to say that although you had a most unspeakably tedious labor at Hudson, the result must have greatly lightened its burden to you and the attorney-general.   I am very glad to hear you speak so favorably of his summing up, and yet all speak the same language who heard it.   I am, further, happy to say that all speak well of the judge, and of the manner in which that very tedious and responsible trial was conducted.

The view you have gained of the moral desolation produced by the anti-rent organizations has been painfully familiar to me for almost a year.   I am compelled to fear that large masses of our citizens, who, before this delusion, were honest, worthy citizens, now think an oath is not binding if it calls upon them to expose the crimes of their associates.   They seem to me to have made up their minds that the oaths and obligations they have taken to each other are paramount to judicial oaths, and that the latter must be falsified as a duty, if the former cannot be preserved without it.

In great haste, I am truly yours,

SILAS WRIGHT.

Hon. JOHN W. EDMONDS.

Before finishing this subject, I may as well relate its finale.

At the time I was holding this court in Columbia, Judge PARKER held a court in Delaware county, where quite a number of anti-renters were convicted and sent to the State prison. At this time Silas Wright was governor.   At the next election he was defeated by the candidate of the opposite party. It was part of the scandal of the day, that he, or some of his

friends, had made a bargain with the anti-renters. How that was I cannot, of course, say; but this I know, he was supported by the whole anti-rent vote, was elected, and pardoned all the anti-renters from State prison; and afterward, when the troubles broke out again in Columbia, he refused to take the measures recommended to him for suppressing them.

P. S.   Now (in 1868), in looking over my papers to prepare these notes for publication, I find two letters which I do not recollect ever having seen before, and I insert them as part of the history of the case.

NEW YORK, November 28, 1845.
DEAR SIR: The enclosed letter, dated at Troy and postmarked Albany, was received this morning. The writer refers in it to another written to you. It is sent to you in order that you may see the spirit with which these anti-renters are actuated, and after you have perused it, if you will be good enough to return it we may publish it perhaps, that the public may see what kind of men there are up in the vicinity of your late labors.

I am, yours, truly,
Hon. Judge EDMONDS.

TROY, November 26, '45.
SIR: Now that the fate of Steenburg and O Conor is over for the present, I make bold to state, that it was that alone, which saved the life of EDMONS this far, the reason why the Job was not put into execution some time since is the fact that it would have had an influence on the fate of those innocent men.

The impostor Silas Write would not have commuted the Sentence, had he not have known that they would have been rescued on the 29th. A secret influence was created which on that day would have made Delhi Celebrated in history and not have stoped until it reached the hart or throat of king Silas. The existence of the Society of " Swing" tho it has ex-

isted for twelve years in the States is not known tho with our branches in different countries we are now affecting some of the most stupendous results upon the destiny of mankind.

The press has in Europe, lately stated that 6 of the society of "Swing" have been taken for cutting the throat of a petty Brittish Landlord.   this statement is a lie, altho the society has existed 17 years with its branches in different countries their has not been one of its regular members taken yet, and yet we have accomplished more than napoleon, in different ways we have disposed of over 300 persons who have laid claim to the Soil, and thereby ground the faces of the poore. Aie the pooore the rightful owners of the soil, the great fiers in Europe and America for 15 years past has been done through the facillities of the Society "Swing" the hand which guides this pen prepaired the chemicals which kindled the too great fires in the citty of New York.  So of Pitsburg and our Canadian neigbour.   I rote the letter to EDMONS "he was evidently illiterit" said the papers.  Now I know that I cant write in the American Language very well, but never mind I understand chemistry well enuf to burn down your fine citties and thereby give work to the suffering poore.  A few months since I was walking about in the citty of Philadelphia and I seen many that wanted bread, as I went along I come to a street they call broad street, and I seen large houses full of flour, and I reflected that the poore wanted bread, I will burn these big ware houses flour and all down.  I went to arch and broad street that same night and the public are aware of the results.

EDMONS is a packed Judge, now we are not anti renters so considered, but the rules of the society of "Swing" is to work with secret meanes for the distruction of such men as EDMONS and Smiling blue eyed Silas Wright.

The family of EDMONS are not gilty of any rong that concerns us.   I have stated the reason that EDMONS was not disposed of we thot to wait until the Delhi matter was settled — the plan decided on is to blow up Judge EDMON's house and mind, we work upon scientific principles anything that we

determin upon we have the meanes of accomplishing, but we wish to fix him and a few others without injureing innocent persons. SWING.

